UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------X
STACEY HARTLINE,

                Plaintiff,

       - against -

ANTHONY GALLO, DARREN GAGNON,
MARLA DONOVAN, JIM SHERRY, VILLAGE
OF SOUTHAMPTON POLICE DEPARTMENT,
and INCORPORATED VILLAGE OF
SOUTHAMPTON,

                Defendants.
----------------------------------X

**MEMORANDUM & ORDER**
03 Civ. 1974 (DRH) (WDW)

**APPEARANCES :**

**WILLIAM E. BETZ, ESQ.**
Attorney for Plaintiff
50 A Sagamore Hill Drive
Port Washington, NY 11050

**DEVITT SPELLMAN BARRETT, LLP**
Attorneys for Defendants
50 Route 111
Smithtown, New York 11787
By: Jeltje deJong, Esq.

**HURLEY, Senior District Judge:**

       Plaintiff Stacy Hartline ("Plaintiff") filed suit against the above-captioned Defendants regarding incidents that occurred following her being pulled over by Southampton Village police on January 6, 2003. Plaintiff alleged (1) violations of her Fourth Amendment rights, pursuant to 42 U.S.C. § 1983; (2) conspiracy to violate her Fourth Amendment rights, pursuant to 42 U.S.C. § 1985; (3) assault and battery; (4) negligent hiring; and (5) violations and conspiracy to violate

her rights under Article I, § 12 of the New York State Constitution, requesting damages in excess of one million dollars. Plaintiff now moves for summary judgment on the issue of liability as to each of her claims and Defendants cross-move for summary judgment. For the reasons set forth below, the Court GRANTS Defendants' motion.

*BACKGROUND*

The following summary of facts is drawn from the parties' Local 56.1 statements, and the parties' submissions. The facts are undisputed unless otherwise noted. Plaintiff is a resident of Southampton, New York. At all times relevant to the present suit, Defendants Anthony Gallo ("Officer Gallo"), Darren Gagnon ("Officer Gagnon"), and Marla Donovan ("Officer Donovan") were residents of Suffolk County, New York, and were employed by the Incorporated Village of Southampton ("Southampton") as police officers for the Village of Southampton Police Department ("Southampton Police"). Defendant Jim Sherry ("Sherry") was the Police Chief of Southampton. Gallo, Gagnon, Donovan, and Sherry are all being sued in both their individual and official capacities (hereinafter, collectively, "Individual Defendants").

On January 6, 2003, at approximately 10:00 AM, Plaintiff was pulled over while driving her truck through Southampton. Officer Gallo indicated that he was pulling her over because her truck was missing its license plate. Officer Gallo approached and stood beside her vehicle. Plaintiff opened the door, rather than rolling down the window, because the window regulator was broken. As Plaintiff was reaching toward her glove compartment to retrieve her license and registration, Officer Gallo observed on the floor of her vehicle a green stem that he recognized as marijuana. Officer Gallo then asked Plaintiff if there was any other marijuana in the vehicle, and she informed him that he "could possibly find a roach or two in the truck." (Defs.' 56.1

her rights under Article I, § 12 of the New York State Constitution, requesting damages in excess of one million dollars. Plaintiff now moves for summary judgment on the issue of liability as to each of her claims and Defendants cross-move for summary judgment. For the reasons set forth below, the Court GRANTS Defendants' motion.

*BACKGROUND*

The following summary of facts is drawn from the parties' Local 56.1 statements, and the parties' submissions. The facts are undisputed unless otherwise noted. Plaintiff is a resident of Southampton, New York. At all times relevant to the present suit, Defendants Anthony Gallo ("Officer Gallo"), Darren Gagnon ("Officer Gagnon"), and Marla Donovan ("Officer Donovan") were residents of Suffolk County, New York, and were employed by the Incorporated Village of Southampton ("Southampton") as police officers for the Village of Southampton Police Department ("Southampton Police"). Defendant Jim Sherry ("Sherry") was the Police Chief of Southampton. Gallo, Gagnon, Donovan, and Sherry are all being sued in both their individual and official capacities (hereinafter, collectively, "Individual Defendants").

On January 6, 2003, at approximately 10:00 AM, Plaintiff was pulled over while driving her truck through Southampton. Officer Gallo indicated that he was pulling her over because her truck was missing its license plate. Officer Gallo approached and stood beside her vehicle. Plaintiff opened the door, rather than rolling down the window, because the window regulator was broken. As Plaintiff was reaching toward her glove compartment to retrieve her license and registration, Officer Gallo observed on the floor of her vehicle a green stem that he recognized as marijuana. Officer Gallo then asked Plaintiff if there was any other marijuana in the vehicle, and she informed him that he "could possibly find a roach or two in the truck." (Defs.' 56.1

her rights under Article I, § 12 of the New York State Constitution, requesting damages in excess of one million dollars. Plaintiff now moves for summary judgment on the issue of liability as to each of her claims and Defendants cross-move for summary judgment. For the reasons set forth below, the Court GRANTS Defendants' motion.

*BACKGROUND*

The following summary of facts is drawn from the parties' Local 56.1 statements, and the parties' submissions. The facts are undisputed unless otherwise noted. Plaintiff is a resident of Southampton, New York. At all times relevant to the present suit, Defendants Anthony Gallo ("Officer Gallo"), Darren Gagnon ("Officer Gagnon"), and Marla Donovan ("Officer Donovan") were residents of Suffolk County, New York, and were employed by the Incorporated Village of Southampton ("Southampton") as police officers for the Village of Southampton Police Department ("Southampton Police"). Defendant Jim Sherry ("Sherry") was the Police Chief of Southampton. Gallo, Gagnon, Donovan, and Sherry are all being sued in both their individual and official capacities (hereinafter, collectively, "Individual Defendants").

On January 6, 2003, at approximately 10:00 AM, Plaintiff was pulled over while driving her truck through Southampton. Officer Gallo indicated that he was pulling her over because her truck was missing its license plate. Officer Gallo approached and stood beside her vehicle. Plaintiff opened the door, rather than rolling down the window, because the window regulator was broken. As Plaintiff was reaching toward her glove compartment to retrieve her license and registration, Officer Gallo observed on the floor of her vehicle a green stem that he recognized as marijuana. Officer Gallo then asked Plaintiff if there was any other marijuana in the vehicle, and she informed him that he "could possibly find a roach or two in the truck." (Defs.' 56.1

Statement ¶ 5; Pl.'s Reply to Def.'s Numbered Statements-Corrected by Plaintiff ¶ 5.) Plaintiff also admitted that there were marijuana seeds in a container in her truck. Plaintiff states that she was then handcuffed while Officer Gallo conducted a search of the vehicle. (Pl.'s 56.1 Counterstatement ¶ 8.) Officer Gallo found a container with marijuana and roaches in the truck, in addition to a metal pipe and a pipe bowl.

After retrieving these items from the vehicle, Officer Gallo drove Plaintiff to the police station. At this point, the parties' accounts diverge, primarily with regard to the sequence of the events. The core facts, however, are the same.

According to Defendants, Officer Gallo processed the arrest paperwork upon arrival. (Defs.' 56.1 Statement ¶ 9.) He inventoried her possessions at 10:37 AM, at which time he found $1,300 in case in her possession. (*Id.* ¶ 11.) Approximately one half hour later, Plaintiff was searched by Officer Donovan, a female. Sergeant Gagnon advised Officer Donovan to "make sure she doesn't have anything on her." (*Id.* ¶ 14.) Plaintiff, who was wearing multiple layers of clothes, was taken into a cell, where Officer Donovan conducted the search. Plaintiff was first instructed to lift her shirt and "flip" her bra, but she was never completely topless. (*Id.* ¶ 16.) Plaintiff was then instructed to remove her thermal underwear and lower her underpants to the ground. (*Id.* ¶ 17.) Plaintiff bent forward at the waist, facing Officer Donovan but there was no body-cavity search of any sort. (*Id.* ¶ 18.) During the search, Officer Donovan believed that Plaintiff was acting erratically. (*Id.* ¶ 20.) Plaintiff was then changed with possession of marijuana, was given a field appearance ticket, and released shortly thereafter. (*Id.* ¶ 21.)

Plaintiff tells a slightly different story. She contends that on the way to the police station she was informed that she would be strip searched. (Pl.'s 56.1 Counterstatement ¶ 12.) On her

account, Officer Gallo did not process her paper work or inventory her possessions until after Officer Donovan had arrived and completed the search. (Pl.'s Reply to Def.'s Numbered Statements-Corrected by Plaintiff ¶ 9.) The details of the search are essentially the same, though Plaintiff reverses the order, asserting that she removed her lower garments first, then flipped her bra second. (*Id.* ¶ 17.) Plaintiff further contends that she was understandably nervous and upset about the arrest, but that her behavior cannot be accurately described as "erratic." (*Id.* ¶ 20.) After the search was finished, Officer Gallo arrived at the cell and escorted Plaintiff to the booking area at which time Officer Gallo inventoried her possessions. (Pl.'s 56.1 Counterstatement ¶ 18.)

Plaintiff was then returned to the cell, where she noticed a video camera in the upper corner. (*Id.* ¶ 20.) As she was being escorted out of the station, she observed a television monitor that appeared to show a cell. (Pl.'s 56.1 Counterstatement ¶ 24.) She asked if the monitor showed the cell she had just occupied, and Officer Gallo told her that it did. (*Id.*) Defendants deny that there was any video camera in her cell. (Defs.' 56.1 Statement ¶ 23.)

Plaintiff subsequently brought the present suit alleging, in essence, that the strip-search was unconstitutional. Plaintiff then moved for summary judgment. Defendants counter-moved for summary judgment, asserting a number of grounds including qualified immunity and governmental immunity.

*STANDARD*

Summary judgment is generally appropriate where the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter

-4-

of law." *Viola v. Philips Med. Sys. of N. Am.*, 42 F.3d 712, 716 (2d Cir. 1994) (quoting Fed. R. Civ. P. 56(c)). The party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion," and identifying those materials "it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

*DISCUSSION*

Plaintiff moves for summary judgment as to each of her claims, *i.e.*, (1) violations of her Fourth Amendment rights; (2) conspiracy to violate her Fourth Amendment rights; (3) assault and battery; (4) negligent hiring; and (5) violations and conspiracy to violate her rights under Article I, § 12 of the New York State Constitution. Defendants cross-move for summary judgment, asserting defenses of: (1) qualified immunity relating to the first and second causes of action against Officers Gallo and Donovan, Sergeant Gagnon, and Police Chief Sherry; (2) Plaintiff's failure to establish a policy or custom that caused a deprivation of rights, relating to the first and second causes of action against Southampton; and (3) governmental immunity regarding the third and fourth causes of action. The Court the claims in turn.

I.  *Violations and Conspiracy to Violate Plaintiff's Fourth Amendment Rights*

The First Cause of Action alleges that Defendants engaged in a "wrongful strip search and body cavity search of the plaintiff" that constituted a violation of and a conspiracy to violate the Fourth Amendment of the Constitution, pursuant to § 1983. (Am. Compl. ¶ 46.)[1]  Plaintiff

---

[1] The Court only considers Plaintiff's § 1983 claim with regard to the strip search. Along with the strip search, the First Cause of Action alleges that Defendant Gallo "arrested the plaintiff without probable cause" (Am. Compl. ¶ 43), that Defendant Gallo searched the vehicle without probable cause (*id.* ¶ 44), and that all of the Individual Defendants and Southampton and Southampton Police "wrongfully videotaped and broadcast for the amusement of themselves and

moves for summary judgment on the grounds that Defendants lacked "reasonable suspicion" to conduct the search, and that Defendants did not use the least intrusive means possible. (Pl.'s Mem. at 8, 12.) Defendants counter-move that the claims against the Individual Defendants should be dismissed because they are deserving of qualified immunity, and the claims against Southampton and Southampton Police should be dismissed because Plaintiff has failed to establish that the search was done pursuant to a policy or custom.

The Fourth Amendment prohibits "unreasonable" searches and seizures. The essential purpose of the Fourth Amendment is to impose a standard of "reasonableness" upon the exercise of discretion by government officials, in order to safeguard individual privacy against arbitrary governmental intrusions. *See Delaware v. Prouse*, 440 U.S. 648, 653-54 (1979); *Phaneuf v. Fraikin*, 448 F.3d 591, 595 (2d Cir. 2006). "A court required to rule upon the qualified immunity must consider . . . this threshold question: Taken in the light most favorable to the party asserting injury, do the facts alleged show the officer's conduct violated a constitutional right? This must

---

others" the strip search (*id.* ¶ 47). Plaintiff has apparently abandoned these other aspects of her § 1983 claim. In her motion for summary judgment, she has failed to address any constitutional claim aside from the strip search. (*See, e.g.,* Pl.'s Mem. at 6 ("It is true that Officer Gallo may have had reasonable suspicion to conduct the initial stop of Ms. Hartline. However, case law has firmly established that this does not automatically entitle a police officer to conduct any search that the officer may decide upon.").) Additionally, all of her legal arguments in favor of summary judgment regarding her § 1983 claim are directed exclusively at the constitutionality of the strip search and make no mention of the search of the vehicle, the arrest, or the videotape. (*See id.* at 8-16.) Furthermore, the summary judgment motion purports to fully decide the issue of liability. (*See* Pl.'s Mem. at 20 ("Ms. Hartline requests that this Court grant her motion for partial summary judgment on the question of the defendants' liability and that this matter be set down for a hearing on damages.").) Finally, though Defendants address Plaintiff's allegations regarding the vehicle search, arrest, and videotaping in their counter-motion for summary judgment, Plaintiff again only addresses the strip search. (*See* Pl.'s Opp'n Mem. at 8-12.) As a result, Plaintiff has effectively waived those alternative grounds for the § 1983 claim, and the Court only addresses the constitutionality of the strip search when considering Count I.

be the initial inquiry." *See Saucier v. Katz*, 533 U.S. 194, 201 (2001). "If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity." *Id.* It is only if a constitutional right has been violated that the court must determine whether a defendant would nevertheless be entitled to qualified immunity. *See Stephenson v. Doe*, 332 F.3d 68, 77 (2d Cir. 2003) ("As a general matter, police officers who violate a plaintiff's constitutional rights are nevertheless entitled to qualified immunity if their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.") (citations and quotation marks omitted).

      *A.*      *Strip Search: Individual Defendants*

Though the Individual Defendants' counter-motion for summary judgment argues that they are "entitled to qualified immunity" (*see* Def.'s Mem. at 4), it should not be read as a concession of the threshold question regarding whether Plaintiff's constitutional rights were violated. Indeed, the Individual Defendants argue throughout their motion that, in the first instance, their conduct "did not violate plaintiff's constitutional rights." (*See, e.g., id.*; *id.* at 5 ("this was a valid search that did not violate Hartline's constitutional rights"); *id.* at 8 ("Even when viewing the facts favorably to Hartline, the search was based upon reasonable suspicion that Hartline was carrying contraband.").) Plaintiff opposes the Individual Defendants' counter-motion on the ground that the strip search was unconstitutional because "[t]here was no articulated or articulable suspicion that Plaintiff was in possession of drugs or contraband." (Pl.'s Opp'n Mem. at 10.)

      1.      *Plaintiff's Fourth Amendment Rights*

For more than two decades, courts have specifically and repeatedly recognized the importance of guarding against unreasonable strip searches. In *Bell v. Wolfish*, 441 U.S. 520 (1979), the United States Supreme Court ruled that Fourth Amendment reasonableness analysis had to balance the need for a particular search against the invasion of personal rights implicated. Stating that the "test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application," *Bell* held that the reasonableness of a strip search turned on (1) the scope of the intrusion, (2) the manner in which the search is conducted, (3) the justification for initiating the search, and (4) the place in which the search is conducted. *Bell*, 441 U.S. at 559 (citations omitted).

The Second Circuit, applying *Bell*, has held that a strip search of a misdemeanor arrestee is unlawful unless there is " reasonable suspicion that the arrestee is concealing weapons or other contraband based on the crime charged, the particular characteristics of the arrestee, and/or the circumstances of the arrest." *Weber v. Dell*, 804 F.2d 796, 802 (2d Cir. 1986). In the sixteen years following *Weber*, the Second Circuit has firmly held that strip searches of persons lawfully arrested for minor infractions (misdemeanors and violations) must be justified by an individualized reasonable suspicion of concealed weapons or contraband. *See e.g. Shain v. Ellison*, 273 F.3d 56 (2d Cir. 2001); *Elk v. Townson,* 839 F. Supp. 1047 (S.D.N.Y. 1993). There would seem to be no constitutional prerogative to strip search individuals in the absence of such particularized reasonable suspicion. *Sarnicola v. County of Westchester*, 229 F. Supp. 2d 259, 270 (S.D.N.Y. 2002).

Though it is sometimes difficult to articulate, the Second Circuit has provided the following definition of "reasonable suspicion":

> A 'reasonable suspicion' of wrongdoing is something stronger than a mere 'hunch,' but something weaker than probable cause. To establish reasonable suspicion, [officers] must point to specific objective facts and rational inferences that they are entitled to draw from those facts in light of their experience. The standard requires individualized suspicion, specifically directed to the person who is targeted for the strip search . . . .

*Varrone v. Bilotti*, 123 F.3d 75, 79 (2d Cir.1997) (citations omitted); *see United States v. Bayless*, 201 F.3d 116, 133 (2d Cir. 2000) ("[T]he concept of reasonable suspicion is not susceptible to precise definition. Nevertheless, it is clear that some minimal level of objective justification is required, and that inchoate suspicion or mere hunch will not suffice.") (citations and quotation marks omitted); *see also Sarnicola*, 229 F. Supp. 2d at 270-71. The reasonable suspicion test is objective, not subjective, *i.e.*, the test is whether a reasonable officer could have particularized suspicion considering the totality of the circumstances. *Cartier v. Lussier*, 955 F.2d 841, 843 (2d Cir. 1992). Thus, there would be a violation of Plaintiff's Fourth Amendment right if the strip search took place in the absence of some individualized reasonable suspicion of concealed weapons or contraband.

The facts, taken in the light most favorable to Plaintiff are these: she was pulled over because the license plate on her truck had fallen off; Officer Gallo observed a marijuana stem on the floor of the vehicle; when asked by Officer Gallo, Plaintiff admitted that he would find more marijuana in the vehicle (*see* Pl.'s Reply to Def.'s Numbered Statements-Corrected by Plaintiff ¶ 5 ("Hartline advised Gallo <u>in response to his questions</u> that he could possibly find a roach or two in the truck."); *id.* ¶ 6 ("In response to Gallo's prodding . . . Hartline told Gallo that there was a container in the back of her truck with seeds from the marijuana."); *id.* ¶ 7 ("Plaintiff either gave Gallo one or two small containers she retrieved from behind the driver's seat, one empty and the

other with several seeds from the marijuana, or she told Gallo where to find them.")); she was handcuffed before her vehicle was searched (Pl.'s 56.1 Counterstatement ¶ 8); Officer Gallo obtained a container from within the vehicle that had marijuana seeds inside as well as a marijuana pipe; she was wearing multiple-layers of clothing (Pl.'s Reply to Def.'s Numbered Statements-Corrected by Plaintiff ¶ 19 ("Hartline was wearing pants, long-johns, a tee shirt, an outershirt and a sweat suit in addition to her panties and bra"); she was acting "nervous and upset as the result of having been arrested" (*id*. ¶ 20); and she was taken to the police station where she was strip-searched.

Under these circumstances, Defendants had individualized reasonable suspicion that Plaintiff had contraband on her person. Judge Broderick's opinion in *Elk v. Townson,* 839 F. Supp. 1047, is instructive. In *Elk*, Officer Townson observed what he believed to be a drug transaction taking place. Elk and his companion, Oliver, were seen taking part in the transaction. Officer Townson called two other officers in the area to arrest Elk and Oliver. Elk disputed these facts, alleging that no such transaction had taken place, and that he had been playing soccer with friends. The following facts, however, were undisputed:

> At about 2:00 PM, the other officers, responding to Officer Townson's call, followed the BMW and stopped it shortly thereafter. Officer Townson arrived a brief time later.
>
> The other officers informed Officer Townson that the vehicle had been searched, and that a film canister containing an indeterminate quantity of marijuana had been found between Oliver and Elk, the two front-seat passengers, within easy reach of Elk. Five small bags of marijuana were taken from Oliver's person, and two five dollar bills were found in Elk's pocket.
>
> All three occupants of the car were arrested and taken to the Sheriff's Department, where they were charged with criminal possession of marijuana in the fifth degree, under section 221.10 of the New York Penal Code, and criminal sale in

>the fourth degree, under section 221.40. . . . Elk claims he was strip searched at
the Sheriff's Department and then released.

*Id.* at 1050. Upon these facts, the court found that the police officers had a reasonable suspicion that Elk had contraband on his person. The court reasoned, "Elk's presence in a vehicle which smelled strongly of marijuana and in which marijuana was found both on another occupant and in a container located near him gave the Sheriff's Office reasonable grounds to suspect that Elk might be hiding drugs on his person." *Id*. at 1052.

The Court is aware that "an automatic justification for strip searches based on an arrest for a drug-related crime would be inconsistent with the legal concept of reasonable suspicion based on the totality of the circumstances." *Sarnicola*, 229 F. Supp. 2d at 273-74 (citing *United States v. Arvizu*, 534 U.S. 266 (2002) (holding that the lower court's "evaluation and rejection of certain factors in isolation from each other [in evaluating reasonable suspicion] [did] not take into account the 'totality of the circumstances'")). The search in the present case, however, was not an unconstitutionally automatic strip search. Rather, the totality of the circumstances created individualized reasonable suspicion that was equal to, if not stronger than, the suspicion in *Elk*.[2]

First, Plaintiff was the only person in the vehicle. Second, marijuana seeds, marijuana paraphernalia, and marijuana roaches were strewn throughout the vehicle. Third, Plaintiff was wearing multiple layers of loose-fitting clothing at the time of her arrest. These facts taken together created a reasonable suspicion that Plaintiff may have had more contraband on her

---

[2]The *Sarnicola* court, in finding the absence of reasonable suspicion, distinguished *Elk* thusly, "[I]n *Elk*, the plaintiff was taken from a vehicle redolent of marijuana, and from close proximity to a canister of marijuana. Here, on the view of the facts most favorable to plaintiff, Sarnicola did no more than drive a car and be seen in conversation with the seller and his supplier." *Sarnicola*, 229 F. Supp. 2d at 274.

person. *See United States v. Asbury*, 586 F.2d 973, 976-77 (2d Cir. 1978) (considering loose-fitting clothing and other incidences of the arrest as factors creating a reasonable suspicion); *Sarnicola*, 229 F. Supp. 2d at 271 (same).

In opposition to Defendants' motion and in support of her own motion, Plaintiff references a number of cases that are factually inapposite.[3] In *Foote v. Spiegel*, 118 F.3d 1416 (10th Cir. 1997), the Tenth Circuit held that a strip search was unreasonable, despite police officer's reasonable suspicion that the arrestee was under the influence of marijuana. The court's conclusion was based upon the fact that "[t]he record establishes a thorough pat-down search through Foote's light summer clothing did not reveal anything. Almost anything the strip search could have revealed would already have been discovered in the pat-down search." *Id.* at 1425. In the present case, Plaintiff was not wearing light summer clothing. She was wearing three layers of loose-fitting clothing and a pat-down search would not necessarily have turned up any contraband on her person.

In *Doe v. Chicago*, 580 F. Supp. 146 (N.D. Ill. 1983), police, pursuant to an arrest warrant, arrested two adults known to be growing marijuana. When the police arrived, the arrestees' daughters were home, and were wearing nightgowns. Police conducted a strip search of the two girls. The court held that a strip search of two girls was unwarranted when the girls "were searched merely because they were the children of a suspected manufacturer-owner of

---

[3] Plaintiff also cites to *Shain v. Ellison*, 273 F.3d 56 (2d Cir. 2001), and *Wachtler v. County of Herkimer*, 35 F.3d 77 (2d Cir. 1994). Both of those opinions stand for the now-unremarkable proposition that a search must be preceded by reasonable suspicion and that a policy requiring strip searches is unconstitutional. *See Shain*, 273 F.3d at 66; *Wachtler*, 35 F.3d at 82. Here, of course, the issue is whether there was reasonable suspicion for the officers to believe that Plaintiff had contraband on her person..

marijuana, happened to be in the house at the time of the search, and were less tractable than their parents." *Id.* at 50. Contrary to Plaintiff's assertions, *Doe* provides no recourse. The present case does not involve unsuspected individuals in their own home wearing clothing that would render hiding drugs difficult.

Finally, Plaintiff cites *United States v. Grotke*, 702 F.2d 49 (2d Cir. 1983). *Grotke* involved a search of an individual at the border. The Second Circuit held that during a routine border inspection, wherein the border patrol found $5,000 in the plaintiff's shoes, "no reasonable suspicion was required, as the search of shoes is 'minimally intrusive.'" *Id.* at 52. It is difficult to understand how *Grotke* provides any support for Plaintiff's position. (*See also* Pl.'s Opp'n Mem. at 11 (citing to *Dodge v. County of Orange*, 282 F. Supp. 2d 41, 85 (holding unconstitutional a policy that "mandates strip searches of all detainees who have been arrested on suspicion of a felony, weapons, or narcotics offense")).)

In sum, construing the facts in the light most favorable to Plaintiff, the Court concludes that the strip search of Plaintiff was conducted with individualized reasonable suspicion that she might have more contraband on her person. As such, Plaintiff's Fourth Amendment rights were not violated and the issue of qualified immunity does not arise.

### 2. *Qualified Immunity*

Even if, *arguendo*, the officers lacked individualized reasonable suspicion, they, nonetheless, would be entitled to qualified immunity. A defendant is entitled to qualified immunity if he can show that, viewing the evidence in the light most favorable to plaintiffs, no reasonable jury could conclude that the defendant acted unreasonably in light of the clearly established law. *Demoret v. Zegarelli*, 451 F.3d 140, 149 (2d Cir. 2006). In other words,

government officials will be immune from liability if they can establish that it was objectively reasonable for them to believe their actions were lawful at the time. *Id.*

A right is clearly established if "(1) the law is defined with reasonable clarity, (2) the Supreme Court or the Second Circuit has recognized the right, and (3) a reasonable defendant would have understood from the existing law that his conduct was unlawful." *Reuland v. Hynes*, 460 F.3d 409, 420 (2d. Cir. 2006) (citing *Anderson v. Recore*, 317 F.3d 194, 197 (2d Cir. 2003)). *Elk* is the decision whose facts most closely mirror those in the present dispute. As noted above, the facts of this case as presented by Plaintiff more strongly support a finding of reasonable suspicion to merit a strip search than the facts presented in *Elk*. And, since its publication, *Elk* has been cited on a number of occasions and its holding has not been called into question. *See Sarnicola,* 229 F. Supp. 2d at 270; *see also Martino v. County of Camden*, No. 04 Civ. 5300 (JBS), 2005 WL 1793718, at *12 (D.N.J. July 26, 2005); *Howard v. Schoberle*, 907 F .Supp. 671, 680 (S.D.N.Y. 1995); *Bennett v. City of Yonkers*, 859 F. Supp. 92, 93 (S.D.N.Y. 1994). Furthermore, no decisions by the Supreme Court or the Second Circuit have suggested flaws in *Elk*'s reasoning.[4] Thus, based upon *Elk* and the absence of Supreme Court or Second Circuit precedent to the contrary, no reasonable police officer would have understood from the existing law that a strip search of Plaintiff under these circumstances was unlawful. *Cf. Wachtler,* 35 F.3d at 81-82 ("We have found no caselaw that addresses the reasonable suspicion issue in circumstances even remotely similar to those in the instant case. Given those circumstances and the lack of legal authority, we cannot say that the individual officers violated a clearly established

---

[4]Indeed, *Elk* applied *Weber*'s "individualized reasonable suspicion"standard to strip searches performed pursuant to misdemeanor arrests eight years before the *Shain* court confirmed that such a standard must be applied.

right in strip-searching Wachtler. Thus, the individual defendants involved in the strip-search are entitled to qualified immunity."). Accordingly, the Individual Defendants' actions are protected by qualified immunity.[5]

In sum, Plaintiff's right to be free of a strip search under these circumstances had not been defined with reasonable clarity by the Supreme Court or the Second Circuit at the time of the search. As a result, even if the Individual Defendants had violated Plaintiff's Fourth Amendment rights, they would be entitled to qualified immunity. Accordingly, Defendants' motion for summary judgment is granted.

    B.    *Strip Search: Southampton and the Southampton Police*

Southampton and the Southampton Police move for summary judgment on two grounds: (1) Southampton Police, as an agency of Southampton, is immune from suit; and (2) that Plaintiff has failed to demonstrate the existence of any municipal policy to deprive individuals of their constitutional rights. As for the arguments regarding the Southampton Police, "[u]nder New York law, departments that are merely administrative arms of a municipality do not have a legal identity separate and apart from the municipality and, therefore, cannot sue or be sued." *Davis v. Lynbrook Police Dep't*, 224 F. Supp. 2d 463, 477 (E.D.N.Y. 2002); *see also Aguilera v. County of Nassau*, No. 05 Civ. 4002 (ADS)(ARL), 2006 WL 2690242, at *3 (E.D.N.Y. Sept. 18, 2006);

---

[5] Under the collective or imputed knowledge doctrine, the conclusion that a reasonable officer could have believed that the strip search comported with clearly established federal law would extend to all of the Individual Defendants, regardless of their individual knowledge. *See United States v. Colon*, 250 F.3d 130, 135 (2d Cir. 2001) ("Under the collective or imputed knowledge doctrine, an arrest or search is permissible where the actual arresting or searching officer lacks the specific information to form the basis for probable cause or reasonable suspicion but sufficient information to justify the arrest or search was known by other law enforcement officials initiating or involved with the investigation.")

*Warner v. Village of Goshen Police Dept.*, 256 F. Supp. 2d 171, 176 (S.D.N.Y. 2003) (dismissing the complaint against the police department). As such, the claims against Southampton Police are dismissed.

As for the claim against Southampton, in order to bring a § 1983 claim against a municipal defendant, a plaintiff must establish both a violation of her constitutional rights and that this violation was motivated by a municipal custom or policy. *See Monell v. New York City Dep't of Soc. Servs.*, 436 U.S. 658, 690-91 (1978); *see also Coon v. Town of Springfield, Vt.*, 404 F.3d 683, 686 (2d Cir. 2005) ("[I]t is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983.").

As articulated above, Plaintiff's constitutional rights were not violated by the strip search. Thus, the disposition of the *Monell* claim is rendered academic: Plaintiff has failed to establish the first prong of municipal liability and the *Monell* claim must be dismissed.

Parenthetically, the Court must emphasize that there is some evidence suggesting that Southampton exercised a policy of strip searching females in violation of their constitutional rights. Officer Donovan testified that she "performed a search of Stacey Hartline in the same manner that [she] conducted searches of all [arrestees] that are female." (*See* Pl.'s 56.1 Statement, Ex. D, at 37-38.) Chief's Sherry's testimony is more ambiguous, but just as troubling. He testified that Plaintiff was "searched thoroughly in accordance to our departmental procedures," but he was non-responsive when asked whether those "thorough searches" always included strip searches. (*See id.*, Ex. E, at 47 ("Q: And that included a strip search, correct?" "A: That included a thorough search." "Q: Which required her to remove her clothing?" "A: It

required a thorough search.").) Based upon Officer Donovan's testimony, and Chief Sherry's "stonewalling" on questions regarding department policy, it may well be that the Southampton Village Police Department had a policy of strip searching all arrested females "placed in a cell," with or without reasonable suspicion. Such a policy, if in existence, is clearly unconstitutional. *See Shain*, 273 F.3d at 66 ("persons charged with a misdemeanor and remanded to a local correctional facility like NCCC have a right to be free of a strip search absent reasonable suspicion that they are carrying contraband or weapons"); *McBean v. City of New York*, 228 F.R.D. 487, 489 (S.D.N.Y. 2005) ("Blanket policies mandating the strip search of every post-arraignment misdemeanor detainee upon admission, regardless of the existence of individualized reasonable suspicion that the detainee is concealing weapons or other contraband, are thus clearly unconstitutional under the law of this Circuit."). But even if that is so, the police had reasonable suspicion vis-à-vis Plaintiff, and thus she lacks standing to assert the *Monell* claim.

III.     *Section 1985 Claim*

Plaintiff also brought a claim pursuant to § 1985, alleging that Defendants "willfully conspired together to deprive plaintiff of her civil rights." (Am. Compl. ¶ 53.) Section 1985(3) provides in pertinent part:

> If two or more persons in any State or Territory conspire . . . for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; or for the purpose of preventing or hindering the constituted authorities of any State or Territory from giving or securing to all persons within such State or Territory the equal protection of the laws; . . . in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a

> citizen of the United States, the party so injured or deprived may have an action
> for the recovery of damages occasioned by such injury or deprivation, against any
> one or more of the conspirators.

42 U.S.C. § 1985(3). Thus, under § 1985(3), Plaintiff must show: "(1) a conspiracy; (2) for the purpose of depriving a person or class of persons of the equal protection of the laws, or the equal privileges and immunities under the laws; (3) an overt act in furtherance of the conspiracy; and (4) an injury to the plaintiff's person or property, or a deprivation of a right or privilege of a citizen of the United States." *Thomas v. Roach*, 165 F.3d 137, 146 (2d Cir. 1999); *see also Traggis v. St. Barbara's Greek Orthodox Church*, 851 F.2d 584, 586-87 (2d Cir. 1988).

The §1985 claim fails because of Plaintiff's failure to allege a conspiracy involving two or more legal entities. *See* 42 U.S.C. § 1985(3) (requiring a conspiracy of "two or more persons"); *Girard v. 94th & 5th Avenue Corp.*, 530 F.2d 66, 70 (2d Cir. 1976) ("A legally sufficient § 1985(3) complaint must aver a conspiracy between two or more persons . . . ."). Under the intracorporate conspiracy doctrine, officers, agents and employees of a single corporate entity are legally incapable of conspiring together. *Nassau County Employee "L" v. County of Nassau*, 345 F. Supp. 2d 293, 304-05 (E.D.N.Y. 2004); *Quinn v. Nassau County Police Dep't*, 53 F. Supp. 2d 347, 359 (E.D.N.Y. 1999) (noting that intracorporate conspiracy doctrine applies to police department); *see also Herrmann v. Moore*, 576 F.2d 453, 459 (2d Cir. 1978); *Girard*, 530 F.2d at 71. The doctrine includes allegations of conspiratorial conduct between a public entity and its employees. *Everson v. N. Y. City Transit Auth.*, 216 F. Supp. 2d 71, 76 (E.D.N.Y. 2002). All of the individuals alleged to be part of the conspiracy are members of the same public entity, *i.e.*, the municipality of Southampton. Furthermore, though "[a]n exception to the intracorporate conspiracy doctrine applies to individuals within a single entity

when they are pursuing personal interests wholly separate and apart from the entity," *Quinn*, 53 F. Supp. 2d at 360, Plaintiff has not alleged that any of the Defendants acted with independent motives. Accordingly, Plaintiff's § 1985(3) claim fails as a matter of law.

III. *State Claims*

The supplemental jurisdiction statute provides that "district courts may decline to exercise supplemental jurisdiction" when "the district court has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c). Granting the moving Defendants' motions to dismiss both of the federal claims, the Court declines to exercise supplemental jurisdiction over Plaintiff's state law claims. *See Schaefer v. Town of Victor*, 457 F.3d 188, 210 (2d Cir. 2006); *see also Tops Markets, Inc. v. Quality Markets, Inc.*, 142 F.3d 90, 102-03 (2d Cir. 1998) (holding that the district court properly exercised its discretion in declining supplemental jurisdiction after dismissing the federal claims on summary judgment). Plaintiff is, of course, free to pursue those causes of action in state court.

*CONCLUSION*

In sum, the strip search of Plaintiff was accompanied by individualized reasonable suspicion that Plaintiff was in possession of contraband. Thus, Defendants' motion for summary judgment on the § 1983 claim is granted because the strip search did not violate Plaintiff's constitutional rights. The Court also grants Defendants' motion regarding the § 1985 claim, which fails pursuant to the intracorporate conspiracy doctrine. Accordingly, Defendants' motion for summary judgment is GRANTED in its entirety. The Clerk of the Court is directed to close this case.

**SO ORDERED.**

Dated: Central Islip, N.Y.  /s/
September 30, 2006  Denis R. Hurley
United States Senior District Judge