UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------X
STACEY HARTLINE,

                Plaintiff,

    -against-                                **MEMORANDUM & ORDER**

ANTHONY GALLO, DARREN GAGNON,        Civil Action No. 03-1974
MARLA DONOVAN, JIM SHERRY,
VILLAGE OF SOUTHAMPTON POLICE
DEPARTMENT and INCORPORATED
VILLAGE OF SOUTHAMPTON,

                Defendants.
-------------------------------------------------------X

**APPEARANCES**:

**The Law Offices of Frederick K. Brewington**
Attorneys for Plaintiff
50 Clinton Street, Suite 501
Hempstead, NY 11550
By:    Frederick K. Brewington, Esq.
        William E. Betz, Esq.
        Scott A. Korenbaum, Esq.
        G. William Germano, Esq.

**Devitt Spellman Barrett LLP**
Attorneys for Defendants
50 Route 111
Smithtown, New York 11787
By:    Jeltje deJong, Esq.


**HURLEY, Senior District Judge:**

        Plaintiff Stacey Hartline ("Plaintiff") filed suit against Defendants Anthony Gallo ("Gallo"), Darren Gagnon ("Gagnon"), Marla Donovan ("Donovan"), Jim Sherry ("Sherry") and the Incorporated Village of Southampton ("Southampton") asserting various claims stemming from an alleged unlawful strip search by Southampton Village Police on January 6, 2003. The

case was tried before a jury over a period of nine days.  The jury returned a verdict in favor of the Defendants.  More specifically, the jury found that Plaintiff did not establish that Gallo, Gagnon, Donovan or Sherry violated her federal civil rights by either subjecting her to a strip search without reasonable suspicion in violation of the Fourth Amendment or denying her equal protection in violation of the Fourteenth Amendment.[1]  Presently before the Court is Plaintiff's motion pursuant to Federal Rule of Civil Procedure 50(b) for judgment as a matter of law on her Fourth and Fourteenth Amendment claims[2] or, in the alternative, for a new trial pursuant to Rule 59.  For the reasons set forth below, the motion for judgment as a matter of law is denied.  With respect to the motion for a new trial, the Court orders additional briefing.

## Discussion

### I. Motion for Judgment as a Matter of Law

#### A. Standard for a Rule 50 Motion

"The standard governing motions for judgment as a matter of law ("JMOL") pursuant to Rule 50 [of the Federal Rules of Civil Procedure], formerly denominated motions for directed verdict or motions for judgment notwithstanding the verdict, is well established." *Galdieri-Ambrosini v. Nat'l Realty & Dev. Corp.,* 136 F.3d 276, 289 (2d Cir. 1998).  A Rule 50 motion

---

[1] Although Plaintiff asserted that there was a video camera on during her strip search, she did not request a charge with respect thereto, taking the position that it was a damages issue for the jury.  (Tr. at 1470-74.)

[2] With respect to her Equal Protection claim, Plaintiff maintains that inasmuch as the Court instructed the jury that she was required to prove that her strip search occurred without reasonable suspicion as an element of the Equal Protection claim, the jury's verdict regarding the Fourth Amendment claim necessarily dictated a verdict in Defendants' favor on the Equal Protection claim and therefore if Plaintiff is entitled to judgment or to a new trial, the jury's verdict must be vacated on both the Fourth Amendment and Fourteenth Amendment claims.  (Reply Decl. ¶ 6.)

"'may only be granted if there exists such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or the evidence in favor of the movant is so overwhelming that reasonable and fair-minded [persons] could not have arrived at a verdict against [it].'" *Kinneary v. City of New York*, 601 F.3d 151, 155 (2d Cir. 2010) (brackets in original) (quoting *Brady v. Wal-Mart Stores, Inc.*, 531 F.3d 127, 133 (2d Cir. 2008)). In considering the motion, "[a] court 'must give deference to all credibility determinations and reasonable inferences of the jury,' and may not weigh the credibility of witnesses or otherwise consider the weight of the evidence." *Caruolo v. John Crane Inc.*, 226 F.3d 46, 51 (2d Cir. 2000) (quoting *Galdieri-Ambrosini,* 136 F.3d at 289). *See also This is Me, Inc. v. Taylor*, 157 F.3d 139, 142 (2d Cir. 1998) (The issue on a Rule 50 motion is whether "'the evidence is such that, without weighing the credibility of witnesses or otherwise considering the weight of the evidence, there can be but one conclusion as to the verdict that reasonable [people] could have reached.'" ) (quoting *Cruz v. Local Union No. 3, Int'l Bd. of Elec. Workers*, 34 F.3d 1148, 1154-55 (2d Cir. 1994)).

      **B.  There was Sufficient Evidence for the Jury to Find Reasonable Suspicion**

Because it is central to the Plaintiff's argument, the Court begins with a discussion of the Second Circuit's decision in this case. In that decision, the Circuit Court held, inter alia, that this Court had erroneously concluded that Defendants were entitled to summary judgment on Plaintiff's claim that the strip search was conducted in violation of the Fourth Amendment. When viewed in the light most favorable to Plaintiff as non-movant, the Second Circuit concluded that the evidence on the motion demonstrated a violation because of the absence of individualized suspicion that she was secreting contraband on her person. That evidence was

3

summarized by the Second Circuit as follows:

> Hartline, a twenty-one-year-old woman, was driving her pick-up truck on the morning of January 6, 2003 in the Village of Southampton, New York. She was running errands for her employer, Best Modular Homes, including a stop at her employer's bank to pick up funds. She was wearing a coat, t-shirt, jeans, long johns, socks, boots, and underwear. At approximately 9:30 a.m., she was stopped by Officer Anthony Gallo of the Southampton Village Police because her truck was missing a rear license plate. Because the driver's side window on the pick-up truck was broken, Hartline needed to open her door to speak to Gallo. Through the open door, Gallo saw a stem of a marijuana plant on the floor of Hartline's truck. He picked it up and told Hartline that if she showed him all the marijuana in the truck she would not be arrested. Hartline answered that there might be some other unusable bits of marijuana in the truck. Gallo then handcuffed Hartline behind the truck and searched it. Gallo found some unusable bits of marijuana, including a butt of a marijuana cigarette, a container with a few seeds, and a pipe. Gallo never asked Hartline if she was carrying any marijuana (or other contraband) on her person.
>
> Gallo took Hartline to the police station. At the police station, Hartline was greeted by Sergeant Darren Gagnon, who told her she would have to wait until a female officer arrived to strip search her. Marla Donovan, a female officer, was then summoned. Donovan took Hartline's handcuffs off and strip searched her in the cell designated for females. Donovan required Hartline first to remove all of her lower garments and bend over while Donovan made a visual inspection of her orifices, and then to remove her upper garments and lift her bra. Hartline was "crying hysterically" during this process.
>
> According to Hartline's evidence, her strip search was conducted pursuant to the Southampton Police Department's policy of strip searching all arrested females, regardless of whether there was individualized suspicion sufficient to justify the search. This evidence included an official report of the incident submitted by Officer Donovan in which she described the strip search of Hartline as done "in the same manner that the undersigned conduct[s] searches of all defendants that are female," and an affidavit of Hartline's stepfather Stephen Wilson, who was a detective in a neighboring town attesting that when Wilson spoke soon after the incident to Southampton's Chief of Police, Jim

4

> Sherry, Sherry acknowledged that all female prisoners are strip searched. In response to Wilson's astonishment, Sherry added, "Steve, you are a cop, you should know.... [Y]ou know the guys do it."
>
> After the strip search, Hartline was booked, photographed, and fingerprinted. At that time, her handbag was searched, revealing $1300 in cash, which she had withdrawn from the bank that morning for her employer. She was then returned to the female cell, where she remained for some time. She then noticed a video camera trained on the area in the cell in which she had been strip searched. The camera appeared to her to be turned on. She was eventually released, and given an appearance ticket for misdemeanor possession of marijuana. As she passed Gallo on her way out, she saw a television monitor near him, showing a cell. She asked him whether the cell shown on the monitor was the one she had been in. He answered that it was.
>
> Ultimately, the misdemeanor marijuana charges against Hartline were dismissed.

*Hartline*, 546 F.3d at 97-98 (footnotes omitted).

Based on the above evidence, again viewed in the light most favorable to Plaintiff as required in the then summary judgment context, the Court of Appeals concluded:

> Officer Gallo had no reason to believe that Hartline was under the influence of narcotics at the time of her arrest. Officer Gallo found no useable narcotics in Hartline's vehicle, nor did he see Hartline take any suspicious actions which might have suggested she was hiding something as he approached her vehicle. Officer Gallo did not notice anything about Hartline's physical appearance that suggested she was secreting drugs on her person, nor did he engage in a less invasive pat down search that suggested the presence of contraband. Hartline answered every question that Officer Gallo asked her about drugs truthfully, yet Gallo did not even ask Hartline if she had any drugs on her person. Furthermore, Hartline had been arrested for nothing more serious than a B-misdemeanor. FN4 *See Foote v. Spiegel*, 118 F.3d 1416, 1425 (10th Cir.1997) ("[A] strip search of a person arrested for driving while under the influence of drugs ... is not justified in the absence of reasonable suspicion that the arrestee has drugs ... hidden on ... her person.... [T]his court expressly rejected the proposition that it is reasonable to strip search every inmate booked on a drug related charge...."); *Way v. County of Ventura*, 445 F.3d 1157, 1162 (9th Cir.2006)

5

> (arrest for misdemeanor drug offense does not support reasonable suspicion necessary to justify strip search).
>
> . . .
>
> Ultimately, if the facts of this case amount to reasonable suspicion, then strip searches will become commonplace. Given the uniquely intrusive nature of strip searches, as well as the multitude of less invasive investigative techniques available to officers confronted by misdemeanor offenders, that result would be unacceptable in any society that takes privacy and bodily integrity seriously.FN5
>
> _____
>
> FN4. In fact, though Hartline was initially charged with a misdemeanor, according to Hartline's evidence, an infraction would have been the more appropriate charge under New York law. See N.Y. Penal Law §§ 221.05, 221.10. All of the charges against Hartline were eventually dismissed.
>
> FN5. We note that this case presents a markedly different set of circumstances than those addressed by the "special needs" standard applied to policies providing for routine strip searches in penal and other institutions housing large, dangerous, or vulnerable populations where introduction of secreted contraband from the outside raises a substantial risk of harm. *See N.G. v. Connecticut*, 382 F.3d 225, 234-37 (2d Cir.2004); *Covino v. Patrissi*, 967 F.2d 73, 76-80 (2d Cir.1992). No such special needs exist where, as here, an arrestee is taken to an empty cell for purposes of an evidentiary search, subsequent booking, and release.

*Hartline*, 546 F.3d at 101-02.

According to Plaintiff, her motion for judgment as a matter of law must be granted "[b]ecause the defendants' testimony, even if credited by the Court, failed to establish as a matter of law that individualized reasonable suspicion existed to strip search [Plaintiff] . . . ." (Pl.'s Supp. Mem. at 2.)³  More specifically Plaintiff maintains that she "established at trial *all of the*

_____

³ Contrary to my direction (Tr. 1685), the parties did not order a copy of the trial transcript and thus the original motion papers filed by the parties did not contain references to the record. By Order dated January 27, 2010, the Court directed the ordering of the transcript and the filing of supplemental memoranda containing pinpoint citations to the record. Supplemental

*material facts* accepted and relied upon by the Court of Appeals in its previous decision in this case." (*Id.* at 9 (emphasis in original).)

Notwithstanding Plaintiff's argument to the contrary, the evidence at trial permitted the jury to find facts different from and/or in addition to the facts presented by Plaintiff on the motion for summary judgment, which different and/or additional facts and the inferences to be drawn from them permitted the jury to conclude that reasonable suspicion existed. Viewing the trial evidence in the light most favorable to the Defendants as required under Rule 50, the jury could have reasonably concluded as follows:

On the day in question, Officer Gallo was trying to pull out of a store parking lot onto a road. Traffic on the road "was kind of slow. It was congested." (Tr. 189.) He was looking to his left as he tried to enter the road when Plaintiff drove by in a red GMC pick-up truck. (*Id.*) Looking through the front untinted windshield of the truck,[4] Gallo saw the Plaintiff smoking a marijuana pipe. (Tr. 286-87.) "She had it up to her face and she was smoking it." (Tr. 286.) Plaintiff and Gallo made eye contact. When she saw Officer Gallo, she dropped the pipe. (Tr. at 286, 338). Officer Gallo pulled out into the road, saw that Plaintiff's truck had no license plate in the rear and pulled her over.

Gallo testified that after he pulled Plaintiff over, he found a pipe with marijuana that was still burning in the door pocket of the driver's side door. There was smoke and a strong odor of

---

memoranda were received in April and May 2010, with the issues being fully framed on May 24, 2010.

[4] That Officer Gallo testified that he observed Plaintiff through the front windshield is significant because Plaintiff maintains that the "limousine-style" tint of her truck's windows would have blocked the officer's vision. But, as noted in the text above, the front windshield was not tinted.

marijuana in Plaintiff's pick-up truck. (Tr. 287, 294, 1380-81, Tr. Ex. A.) According to Gallo, Plaintiff looked "stoned." (Tr. 299.) A search of the vehicle yielded a plastic container with marijuana remnants and several roaches. (Tr. 289, 297.) Officer Gallo conducted a pat down search around Plaintiff's waist but could not tell whether she was carrying any contraband "[d]ue to the amount of clothing that [Plaintiff] had on." (Tr. 216-17, 304, 328.) Plaintiff advised Officer Gallo that her "father"[5] was a police officer for the Town of Southampton. Officer Gallo allowed Plaintiff to try to reach her father by telephone but she was unable to do so. (Tr. 206.) Plaintiff was then transported to police headquarters. (Tr. 220.)

Upon arriving at headquarters, Officer Gallo started to inventory Plaintiff's possessions. Sergeant Gagnon arrived and Officer Gallo showed him the contraband he had seized and they discussed the charges to be brought against Plaintiff. (Tr. 300.) Plaintiff refused to answer Gagnon's questions as to the identity of her suppliers and showed extensive knowledge regarding the propensities of marijuana. (Tr. 925-26.) A few minutes later Officer Donovan arrived. Sergeant Gagnon instructed Officer Donovan to search Plaintiff thoroughly and left. (Tr. 513-14.) The pre-search inventory of Plaintiff's pocketbook continued according to Gallo and Donovan; it revealed a debit card, four photo drivers' licenses, and $1,300.00 in cash. (Tr. 301, 303, 515-18, 630.) Although Plaintiff claimed that she was a secretary and had just gone to the bank for her employer, according to Officer Donovan the money was in Plaintiff's wallet and she (Officer Donovan) did not see any envelope, (Tr. 517, 532); Plaintiff was disheveled and wearing three shirts, a pair of jeans, a pair of thermals, three pairs of socks and a pair of boots

---

[5] The testimony of both Officer Gallo and Plaintiff is that she said her "father" was a police officer and she wanted to call her "father," (*see, e.g.,* Tr. 837, 840; *see also* Tr. 852-53), although the person she was referring to was her stepfather, (Tr. 288, 697, 913-914).

(Tr. 634-36), which a jury could conclude was not usual office attire.

After the inventory of her possessions, Plaintiff was taken by Officer Donovan to a female cell. She was "giggly", "laughing," and "wasn't taking it very seriously." (Tr. 632-33.) Officer Donovan then conducted the search as follows: Plaintiff was told to remove the two outermost shirts, which she did and handed them to Donovan who checked the pockets and shirts for contraband. (Tr. 636.) Donovan then had her pull the remaining shirt, which was a thermal, up to the bra line and pull out her bra so Donovan would see if anything fell out. Plaintiff was not asked to unsnap her bra and her breasts were not exposed. (Tr. 527-28, 530, 637, 660.) After she lifted up her shirt and pulled out her bra, Plaintiff put her (thermal) shirt, which went down to her hip area, back down. (Tr. 535, 637.) Plaintiff then removed her jeans so that she was in her thermal top and thermal bottom. Donovan checked the jeans for paraphernalia. (Tr. 533, 637.) Plaintiff, while facing Officer Donovan, then pulled the thermal bottom and her panties down to her knees. Although asked to squat, Plaintiff bent forward at the waist stating she was not a crack head and did not need to be searched. (Tr. 534-540; 637-39). Plaintiff was then instructed to pull up her garments, have a seat on the bench and take off her socks, one at a time. (Tr. 638.) Plaintiff did not seem upset during the search; she did not cry and was cooperative. (Tr. 639.)[6]

Unlike the facts viewed in the light most favorable to the Plaintiff as required in the summary judgment context and relied upon by the Second Circuit in reversing the grant of summary judgment in Defendants' favor, the testimony at trial permitted the jury to conclude that the Defendants had reason to believe that Hartline was under the influence of narcotics at the

---

[6] The Court notes that Plaintiff's description of the search varies greatly from that of Officer Donovan. According to Plaintiff, she was completely naked and her orifices were visually inspected.

time of arrest as Gallo saw her smoking a marijuana pipe, the truck was filled with smoke, he found the smoldering pipe, she looked "stoned", and was "giggly."[7] Officer Gallo found a container with only a small amount of marijuana, which according to Gallo Plaintiff identified as "shake", as well as several "roaches."  Assuming the jury concluded that the amount of marijuana in the container was insignificant, the fact that the vehicle search did not disclose the source of the burning marijuana in the pipe could suggest that, unless the drugs in the pipe represented the last of her immediate stash, the remainder was on her person.  (*Cf.* Tr. at 467 (Gagnon's testimony that "There wasn't a lot of marijuana there, and it is possible she secreted more on her person.").)  Another suspicious fact found in the trial evidence was the large amount of cash discovered in her purse prior to the search according to the testimony.[8]  These facts support the existence of reasonable suspicion.  *See, e.g., Wachtler v. County of Herkimer*, 35 F.3d 77, 80 (2d Cir. 1994) ("possession of $1,000 in cash might have seemed a ground for suspecting drug trafficking and the possible presence of contraband."); *Easton v. City of New York*, 2009 WL 1767725 (E.D.N.Y. 2009) (that plaintiff was smoking marijuana at time of arrest, a bag of marijuana was found incident to his arrest and he was carrying $1,000.00 in cash supported reasonable suspicion for strip search).

Plaintiff's reliance on Sergeant Gagnon's statement that he ordered the search of Plaintiff

---

[7] Plaintiff points to the fact that she was not charged with driving under the influence to support her claim that she was not smoking marijuana in her car that morning.  However, the jury could have discounted the fact that Plaintiff was only charged with possession of marijuana rather than driving under the influence given that Plaintiff reported herself as the daughter of a police detective for Southampton Town.

[8] Viewing the facts as to this temporally disputed issue in the light most favorable to Plaintiff, the Second Circuit stated that it was not until after the strip search that an inventory was taken and the money discovered in Plaintiff's purse.

solely because she was in possession of contraband (Tr. 358) and her argument that the $1,300.00 in her possession played no part in the decision to order her strip searched (Pl.'s Supp. Mem. at 7, 8 n.5) is misplaced.  The Court instructed the jury, without objection by Plaintiff, that "reasonable suspicion can be established by 'collective' or pooled' knowledge of the individual officers involved.  Thus. for example, should you find that defendant Gallo had sufficient information to give rise to reasonable suspicion that knowledge is equally attributable to defendant Gagnon who directed defendant Donovan to conduct a thorough search, and to defendant Donovan as well."  (Tr. 1595.)  In the current motion Plaintiff makes no claim of error in this aspect of the charge and the Court perceives none.  As the Second Circuit has explained: "Whether a particular strip search is constitutional 'turns on an objective assessment of the . . . facts and circumstances confronting [the searching officer] at the time, and not on the officer's actual state of mind at the time' of the search.  In other words, the fact that the officer who actually conducted the search did 'not have the state of mind which is [hypothesized] by the reasons which provide the legal justification for the [search] does not invalidate the [search] as long as the circumstances, viewed objectively, justify that [search].'" *Hartline*, 546 F.3d at 100 (modifications in original) (internal citations omitted).

     As the evidence at trial viewed in the light most favorable to the Defendants permitted the jury to find that there was reasonable suspicion to believe that Plaintiff was secreting contraband on her person, the motion for judgment as a matter of law pursuant to Rule 50 of the Federal Rules of Civil Procedure is denied.

**II.     The Motion for a New Trial**

    **A. Standard for Rule 59 Motion**

A "motion for a new trial 'ordinarily should not be granted unless the trial court is convinced that the jury has reached erroneous result or that the verdict is a miscarriage of justice.'" *Patrolmen's Benevolent Ass'n of City of New York v. City of New York*, 310 F.3d 43, 54 (2d Cir. 2002) (quoting *Atkins v. City of New York City*, 143 F.3d 100, 102 (2d Cir. 1998)). *See also DLC Management Corp. v. Town of Hyde Park*, 163 F.3d 124, 133 (2d Cir. 1998) ("As a general matter, a motion for a new trial should be granted when, in the opinion of the district court, the jury has reached a seriously erroneous result or . . . the verdict is a miscarriage of justice.") (internal quotations omitted). "A new trial may be granted, therefore, when the jury's verdict is against the weight of the evidence. *DLC Management*, 163 F.3d at 133. "Unlike judgment as a matter of law, a new trial may be granted even if there is substantial evidence supporting the jury's verdict." *Id.* at 134; *accord Manley v. AmBase Corp.*, 337 F.3d 237, 244 (2d Cir. 2003). On a motion for a new trial pursuant to Rule 59, a court may weigh the evidence and need not view the evidence in a light most favorable to the defendants. *See Song v. Ives Labs., Inc.* 957 F.2d 1041, 1047 (2d Cir. 1992). Indeed, "the district court is permitted to 'examine the evidence through its own eyes.'" *Green v. City of New York*, 359 Fed. Appx. 197, *2 (2d Cir. Dec. 30, 2009) (Summary Order) (quoting *Meloff v. New York Life Ins. Co.,* 240 F.3d 138, 147 (2d Cir. 2001)). "A court considering a Rule 59 motion for a new trial must bear in mind, however, that the court should only grant such a motion when the jury's verdict is 'egregious.' Accordingly, a court should rarely disturb a jury's evaluation of a witness's credibility." *Id.* at 134 (quoting and citing *Metromedia Co. v. Fugazy*, 983 F.2d 350, 363 (2d Cir.

1992), *abrogated on other grounds by Gustafson v. Alloyd Co.*, 513 U.S. 561 (1995)).

Here, Plaintiff's motion for a new trial is premised on the argument that "defendants' stated justifications for the strip search lack credibility." (Pl.'s Supp. Mem at 12.) More specifically, Plaintiff attacks Gallo's testimony as "defy[ing] logic" and "materially false." (*Id.* at 14.) Plaintiff did not object to any portion of the jury charge material for present purposes (*see* Tr. 1422-760), and she raises no errors in the charge in the instant motions.

Many of Plaintiff's contentions regarding the testimony have been addressed above in the Court's recitation of the facts the jury could have found based on the evidence adduced at trial. Only a few bear mention here. While Gallo's reports were considerably less than model police paperwork, he did testify that the omissions and errors were due to his difficulty in operating a new computer system. His testimony that he saw Plaintiff smoking a marijuana pipe, though not free from doubt, finds corroboration in (1) Officer Wetter's testimony that there was a strong odor of marijuana in the car indicating to him that marijuana had been smoked in the truck very recently, (Tr. 1380-81); (2) Officer Wetter's statement that Officer Gallo told him he found a marijuana pipe that was still burning, (Trial Ex. H); and (3) Sergeant Gagnon's testimony that when he met Officer Gallo at the station Officer Gallo told him that he observed Plaintiff smoking marijuana while driving, (Tr. 466). Additionally, the Criminal Information sworn out by Gallo on the day of the arrest refers to Hartline "possess[ing] marihuana in a public place . . . and such marihuana was burning or open to public view, to wit; [Hartline] did possess a burning marijuana pipe which was open to public view." (Trial Ex. A.) There were "roaches" and a container of seed and detritus found in her car. The pipe discovered in her car and placed into evidence had partially burned marijuana in it. (Tr. 906-07.) In sum, there is sufficient evidence

to preclude this Court from concluding that the jury's verdict was seriously erroneous or a miscarriage of justice.

The matter is not at an end, however. Upon review of its charge to the jury, the Court has a concern as to whether its reasonable suspicion charge was proper.

> If the charge was not correctly formulated, sua sponte consideration would have to be given to granting a new trial under the "manifest injustice" prong of Rule 59(a). *See King v. Deutsche-Dampfs-Ges.*, 397 F. Supp. 618, 622 (S.D.N.Y.1974) (new trial ordered on court's own motion because of improper jury charge, after giving parties notice and opportunity to be heard); *see also Failla v. City of Passaic*, 146 F.3d 149, 156 (3d Cir.1998) (sua sponte exercising discretion to review jury instructions and interrogatories as part of court's determination that a new trial was warranted); *Murphy v. City of Long Beach*, 914 F.2d 183, 186-87 (9th Cir.1990) (improper jury charge one of reasons for sua sponte grant of new trial).

*Arnold v. County of Nassau*, 89 F. Supp. 2d 285, 297-98 (E.D.N.Y. 2000), *rev'd on other grounds*, 252 F.3d 599 (2d Cir. 2001).

As to reasonable suspicion, the Court charged the jury as follows:

> The Fourth Amendment to the United States Constitution provides in pertinent part, the right of the people to be secure in their persons against unreasonable searches shall not be violated.
> It is well established that the Fourth Amendment precludes officials from performing strip searches of arrestees charged with misdemeanors or other minor offenses unless the officials have a reasonable suspicion that the arrestee is concealing weapons or other contraband upon their person, based upon the crime charged, the particular characteristics of the arrestee, and/or the circumstances of the arrest.
> Reasonable suspicion has been defined by the appellate courts as something stronger than a hunch but something less than probable cause. To understand that definition you need to understand probable cause. That term, that is, probable cause, means reasonable grounds to believe that an offense has been committed by a suspect. Again, reasonable suspicion, the

applicable standard here, is something less than probable cause but greater than a hunch.

. . . To establish reasonable suspicion, the officers involved must point to specific objective facts and rational inferences that they are entitled to draw from those facts in light of their experience. The factors that you may consider, among others, and to the extent you deem it appropriate, in determining whether the defendant officers had reasonable suspicion at the time of the search to believe plaintiff had illegal drugs hidden on her person include:

Excessive nervousness, unusual conduct, information showing pertinent criminal propensities, loose-fitting or bulky clothing, discovery of incriminating matter during less intrusive searches of their person or property, lack of employment or a claim of self employment, evasive or contradictory answers to questions, the crime charged; and the circumstances of the arrest.

This list is not meant to be exhaustive and no factor is necessarily dispositive; you may consider any, all, or none of these factors in making your determination. Nonetheless it may be helpful to you in reaching your decision.

Plaintiff maintains that defendants did not have reasonable suspicion to believe that she had contraband hidden on her body on January 6, 2003, and defendants contend that they did given the totality of the circumstances. It will be for you, as the trier-of-fact, to resolve this factual dispute.

To prepare you for that task, some further instructions are required; namely (1) although different persons may define the term differently, the search conducted by Defendant Donovan was a "strip search" under both the officer's rendition of how the search was conducted as well as plaintiff's rendition, and (2) reasonable suspicion can be established by "collective" or "pooled" knowledge of the individual officers involved.

Thus, for example, should you find that Defendant Gallo had sufficient information to give rise to reasonable suspicion that knowledge is equally attributable to Defendant Gagnon who directed Defendant Donovan to conduct a thorough search, and to defendant Donovan as well.

In sum, your job as to this second element of plaintiff's strip search cause of action is to determine whether there was reasonable suspicion to believe that plaintiff had illegal drugs on her person. If you find reasonable suspicion was present, then your verdict as to this federal claim must be for all defendants.

Tr. at 1592-95.

The Court's charge failed to instruct the jury as to two matters referred to by the Second Circuit in reversing this Court's grant of summary judgment in favor the Defendants. First, that the arrest for a misdemeanor drug offense by itself does not as a matter of law support reasonable suspicion necessary to justify a strip search. *See* 546 F.3d at 101. Second, that the search seemingly was not justified by security concerns given that Plaintiff was taken to an empty cell for purposes of a search, subsequently booked and released. *See id.* at 102. The question is whether either omission was error and, if so, was it an error sufficient to grant a new trial given Plaintiff's failure to object to the Court's charge. As the Court is raising these issues sua sponte, the parties shall be given an opportunity to address them.

## Conclusion

For the reasons set forth above, the Rule 50 motion for judgment as a matter of law is denied and on the Rule 59 motion for a new trial the parties are directed to file letter briefs on the issues specified herein on or before August 25, 2010; responses may be filed on or before September 3, 2010.

**SO ORDERED.**

Dated: Central Islip, New York
August 4, 2010

                                                    /s/
                                                Denis R. Hurley
                                                Senior District Judge